Kunkle *v.* The State.

———————————•———————————

**KUNKLE *v.* THE STATE.**

CRIMINAL LAW.—*Recapture of Personal Property from Trespasser.*—In an attempt to recapture personal property taken from the possession of the owner by a trespasser, the law does not justify the owner in a resort to the use of a deadly weapon in such manner as to be reasonably calculated to endanger human life, although, because of the superior physical power of the trespasser, such object cannot be otherwise accomplished; nor does the law justify the owner, in such case, in a resort to even such force as will amount to a breach of the peace, but leaves him to his legal remedy.

SAME.—*Assault and Battery with Intent to Commit Murder.*—The material facts necessary to be established to justify a conviction under an indictment charging the defendant with having committed an assault and battery on the body of another, with intent to murder him, are, first, that the defendant committed the assault and battery as alleged; second, that at the time of its commission he intended thereby to kill such other person; and third, that if death had resulted from the act, the crime, in legal contemplation, would have been murder.

SAME.—*Intent.*—*Evidence.*—That the defendant in such a case intended to kill, is a question of fact for the jury. In the absence of direct evidence

Kunkle *v.* The State.

(such as prior threats, or a preparation for the consummation of the deed, and lying in wait with a deadly weapon), if the assault and battery is perpetrated with a deadly weapon used in such a manner as to be reasonably calculated to destroy life, the intent to kill may be inferred as a fact from the act itself.

SAME.—*Adaptation of Means Used.*—To justify a conviction of an intent to murder in the commission of an assault and battery, there must be some adaptation, real or apparent, in the act done and the means used, to accomplish the alleged purpose. If it be evident to every reasonable mind that the means used are entirely inadequate to the consummation of the intent charged, that fact will rebut or disprove the felonious intent, and a conviction cannot be justified. But where the object is not accomplished because of an impediment which is of such a nature as to be wholly unknown to the offender, who uses appropriate means, though not fully or only apparently adapted to the object, the criminal attempt is committed.

SAME.—*Case Disapproved.*—The State v. Swails, 8 Ind. 524, disapproved, so far as it lays down the broad proposition, that, to constitute an assault and battery with intent to commit a felony, the intent and the present ability must necessarily be conjoined.

SAME.—*Evidence.*—Where, on the trial of such an indictment, the evidence showed that the defendant shot at the prosecuting witness twice, at a distance of not exceeding thirty steps, with a shot-gun, loaded with powder and shot; that one of the discharges, at least, was fired at the face and neck of the prosecuting witness, many of the shot taking effect and inflicting upon him great bodily harm, one of his eyes being destroyed and the other seriously wounded;

*Held,* that, assuming that the act was done with intent to murder the prosecuting witness, and that the defendant only failed in his purpose because the shot were incapable of producing death, owing to the distance between the parties and the manner in which the gun was loaded, then the evidence justified a conviction of the felonious intent.

SAME.—*Instruction to Jury.*—On the trial of such indictment the court instructed the jury, that if they should find from the evidence, to the exclusion of a reasonable doubt, that the defendant intended to kill the prosecuting witness at the time, yet they would be warranted under the law in acquitting the defendant of the intent to kill, if it was manifest and clear from the evidence that, because of the manner in which the gun was loaded, or because of the distance between the defendant and the prosecuting witness, "it was physically impossible that death could possibly have resulted from the use of the means employed."

*Held,* that the charge was too favorable to the defendant, and he had no right to complain of it.

APPEAL from the Marion Criminal Circuit Court.

ELLIOTT, J.—Jacob Kunkle, the appellant, was tried and convicted on an indictment for an assault and battery on

the body of Francis M. Kestler, by shooting him with a gun loaded with gunpowder and shot, with intent to murder him, and was sentenced to pay a fine of one cent, and be imprisoned in the state prison for the term of four years.

The errors assigned are based on the refusal of the court to grant a new trial, for alleged errors of law occurring at the trial. The causes for a new trial were stated as follows:

"1st. The verdict of the jury is contrary to law.

"2d. The verdict of the jury is contrary to the evidence.

"3d. The court misdirected the jury in a material matter of law. The presentation of the facts of the case in the charge of the court was not accompanied with the information to the jury that they were the exclusive judges of all questions of fact. Which said charge was given, and excepted to at the time by the defendant.

"4th. The court committed an error of law in refusing to admit testimony offered by defendant, on the trial of said cause, showing the superior physical power of Kestler over defendant, to which ruling of the court the defendant, at the time, did except.

"5th. The court erred in giving a charge to the jury calculated to mislead the jury upon a point material in the determination of said cause, which was excepted to at the time by the defendant.

"6th. The court committed an error in refusing to charge the jury as requested by the defendant, which said instructions were reduced to writing and inspected by the court and refused."

The third cause for a new trial is not urged in the appellant's brief. In fact, it seems to be without any foundation to rest upon.

The judge, in charging the jury, did not present to them the facts of the case, and, on that subject, instructed them as follows: "8th. You are to determine the law and the evidence of the case. It is made, by the law, the duty of the court to instruct you in regard to the law bearing upon the case. You are also the judges of the credibility of the

Kunkle *v.* The State.

witnesses, and may resort to such means as the testimony of the case affords you, in order to determine their credibility."

The second cause for a new trial, viz., that the verdict of the jury is contrary to the evidence, will next be examined.

The facts of the case, disclosed by the evidence, are, substantially, as follows: The appellant is the son, and Kestler, the prosecuting witness, is the son-in-law, of Jacob Kunkle, Sen. Kestler and his family lived with Jacob Kunkle, Sen., in the house of the latter, whose family consisted of himself and two sons, or, in other words, the two families lived together as one, Kestler's wife. doing the housework. Kunkle, Sen., owned a mill, near to which was the house in which he lived. The appellant and his family also. lived near the mill, and only about one hundred and twenty-five yards from the residence of his father. There was an old mill on the premises that belonged to Kunkle, Sen., which, in January, 1869, he had torn down, and the old timbers thereof were hauled, with Kestler's team, and deposited in the mill yard, within fifteen or twenty steps of the appellant's " chip pile," or place where the wood for the use of his house was usually deposited. The appellant having no team, these logs were given to him by his father for fire wood, though Kestler denies that he was aware of that fact. On the evening of the 23d of February, 1869, which, according to the evidence, was a very cold day, Kestler went to the log pile referred to, and with his axe split open one of the old mill sills, which was about fifteen feet in length, and quartered one of the halves, and then went to his supper. After supper he returned to the log pile with John Kunkle, a brother of the appellant, and found that the appellant had carried the log, which he, Kestler, had split before supper, and deposited it on his own chip pile. Kestler then helped John Kunkle split another log. The appellant came out after wood, when Kestler told him he had "played thunder," in taking the log he, Kestler, had split; that he only wanted one stick for kindling.

Kestler testifies, that the appellant muttered something in reply, which he did not understand, and then went into the house with an armful of split wood. John Kunkle testifies, that the appellant told Kestler to let the wood alone, as he wanted it for his own use. When the appellant went into the house, Kestler went to the wood pile and took one of the sticks he had split before supper, and started away with it; the appellant then came out of his house with a double-barreled shot-gun, Kestler being between twenty-five and thirty steps from him, and shot Kestler twice. As there is some conflict in the evidence as to just what did occur at this juncture, we give the statements of the several witnesses. Kestler testifies, " When I was twenty-five or thirty steps from the defendant's house, I heard the report of a gun, and felt some shot hit me in the arm and side. I then turned round sideways to see what it was. I saw defendant standing in his gate with a double-barreled shot-gun aimed at me. No sooner had I turned my head toward him than he fired a second shot, which took effect in my neck and face."

John Kunkle says, " Defendant went to his gate and told Kestler to put the wood down, or he would know the reason why. Kestler turned around and told defendant to shoot and be damned, and defendant then fired twice."

Jacob Kunkle, Sen., testifies, that he saw the transaction, that he " heard defendant tell Kestler to drop the wood, or he would hurt him. Saw Kestler turn around and tell defendant to shoot and be damned; that thereupon the defendant shot twice at Kestler."

George Taylor says, he was at the defendant's house when the shooting occurred. " Heard defendant tell Kestler to drop his wood, or he would shoot him, and heard Kestler make a reply, but could not tell what it was. Defendant then shot twice, in quick succession." When the second shot was fired, Kestler dropped the stick of wood, and was led to the house by John Kunkle.

Kestler testifies, that by the shooting the sight of one of

his eyes was entirely destroyed, and the other so injured that he could scarcely see to recognize a person, even his own wife, though "standing right in front of" him. He further testifies, that at the time he was shot he had on a very heavy overcoat, with the collar of it, a very heavy one, turned up around his neck and face; that part of the collar was blown to pieces, "it being that part which covered the jugular vein and carotid artery;" that several of the shot penetrated his neck, and sixty or seventy of them entered his body. He also testifies that his father-in-law, that morning, wanted him to haul up for wood a certain elm top, on the premises, which he declined to do because one Holmes claimed it; and that when he was splitting the log, before supper, the defendant said to him to get off of his wood pile. Witness thought he was joking.

Doctor Manker testifies, that he was called to see Kestler, after the shooting, on the evening of the 23d of February, 1869, and found him entirely blind of one eye, and the other severely wounded. There were several shot in the neck near the jugular vein and carotid artery, and he counted sixty or seventy shot in the arm and body—left arm and side; that he believed the shot were number three, common squirrel shot.

Jacob Kunkle, Sen., testifies, that before Kestler went to get the wood, he told him not to interfere with the defendant's wood; that he had given the timbers and logs from the old saw-mill to the defendant, as he had no team to haul his wood; that the gun was a double-barreled shotgun, lightly loaded, he thought, from the report when it was discharged.

There was also evidence that the defendant was reputed as a peaceable and inoffensive man.

We see nothing in the evidence to justify the acts of the appellant. On the contrary, we think it sustains the verdict of the jury.

During the trial, the appellant offered to prove by one

Meredith and other witnesses, "that Kestler was overbear-ing and quarrelsome, and possessed of physical powers far superior to the defendant;" but the court refused to permit the evidence to be given to the jury, and the appellant ex-cepted.

The refusal of the court to admit this evidence is the fourth cause urged for a new trial.

The evidence was properly excluded, on the ground that it was not relevant to the case as presented by the other evidence. There was nothing in the transaction, as dis-closed by the evidence, from which the act of the appellant, in shooting Kestler, would be justified, excused, or extenu-ated by the facts sought to be given in evidence. The rel-evancy of the evidence seems to be claimed on the ground that the appellant might lawfully defend his possession of the wood, or retake it from Kestler, and, for that purpose, could resort to whatever force might be necessary to accom-plish the end, even to taking life; and, therefore, that it was proper to show that, because of the superior physical pow-ers of Kestler, the appellant could not accomplish the end without resorting to the use of a deadly weapon. The act of Kestler in taking the stick of wood was, at most, only a petty trespass, and the law regards human life too highly to justify the use of deadly weapons in such a manner as to involve it in extreme peril in the defense of the possession of personal property against a mere tres-passer.

The fifth and sixth causes relate to the instructions given by the court to the jury, and to those asked by the appel-lant which the court refused. The fifth cause is somewhat indefinite, but construing it to relate to all the instructions given by the court to which the appellant excepted, we will examine the questions raised thereon by counsel. The court gave to the jury this instruction, viz.: "If the jury shall be satisfied from the evidence, beyond a reasonable doubt, that, at the time and place to which the evidence points, the defendant did shoot Kestler with a gun loaded

with powder and shot, some of the shot taking effect upon the person of Kestler, and that he so shot Kestler with the intent, at the time, of killing Kestler, you would be warranted, under certain decisions of our Supreme Court, to acquit the defendant of the intent to kill, if it is manifest and clear from the evidence that because of the manner in which the gun was loaded, or because of the distance between the defendant and Kestler, it was physically impossible that death could possibly have resulted from the use of the means employed." And the court refused to give the following instruction asked by the appellant: "If the gun, in the manner in which it was loaded and the distance the defendant stood from Kestler when he discharged the gun, was incapable of killing Kestler, the jury must acquit the defendant of the intent to kill." The principal question discussed on the instructions given and refused is presented by those copied above.

In some of our sister states, as well as in England, "an attempt" to commit certain crimes is made, by statute, a distinct substantive offense, and some of those statutes declare what particular act or acts shall constitute such "an attempt." Our statute is somewhat different; it declares that "every person who shall perpetrate an assault, or an assault and battery, with intent to commit a felony, shall, upon conviction thereof, be imprisoned," &c. Either an assault, or an assault and battery is, of itself, a substantive offense, and punishable as such; but if perpetrated with the intent to commit, or, in other words, in attempting to commit, a felony, then, under the statute, it is raised to a higher grade of offense, and is visited with much greater punishment.

Here, the appellant is charged with having committed an assault and battery on the body of Kestler, by shooting him with a gun loaded with powder and shot, with intent to murder him. The material facts necessary to be established to justify a conviction of the appellant for the higher offense charged, are, first, that he committed the assault and battery on Kestler as alleged; second, that at the time of its commis-

sion he intended thereby to kill Kestler; and third, that had death resulted from the act, the crime, in legal contemplation, would have been murder.

That the appellant shot Kestler in the manner alleged, and thereby inflicted upon him great bodily harm, is not controverted.

That he intended thereby to kill Kestler, was a question of fact for the jury, the proof of which rested upon the State, and unless so proved, the appellant was entitled to an acquittal of the felonious intent charged. But in determining the question, it was the duty of the jury to consider all the facts and circumstances disclosed by the evidence bearing upon it. The felonious intent in such a case might be shown by direct evidence, such as prior threats, or a preparation for its consummation, and lying in wait for an opportunity with a deadly weapon. And in the absence of any such direct proof, if the assault and battery is perpetrated with a deadly weapon, used in such a manner as to be reasonably calculated to destroy life, the intent to kill may be inferred, as a fact, from the act itself, upon the principle that every man is presumed to intend the natural, necessary, and even probable consequences of an act which he intentionally performs. Here the instruction given by the court, to which exception is taken, it will be observed, does not relate to the act of the appellant, in shooting Kestler, as evidence of the felonious intent. On the contrary, it is predicated on the hypothesis that the jury find from the evidence, to the exclusion of rational doubt, that the appellant shot Kestler with the intent, at the time, of killing him. But it says to the jury that, notwithstanding they so find, still they would be warranted, under the law, in acquitting the defendant of the intent to kill, if it was manifest and clear from the evidence that, because of the manner in which the gun was loaded, or because of the distance between the defendant and Kestler, it was physically impossible that death could possibly have resulted from the use of the means employed. The instruction refused is also an

assumption of a principle of law claimed to govern the case, independent of the question of the evidence that might have been adduced upon the question of intent, and was not directed to the question of any inference of intent to be drawn from the act of shooting. In substance, there is but little difference between the charge given and that refused. The difference is more in the language than in legal effect. By the charge refused, the court was asked to say to the jury, that if the gun, from the causes stated, was incapable of killing Kestler, the jury should acquit. In the charge given, the court said to the jury, that if it was manifest and clear (from the same causes) that it was physically impossible that death could possibly have resulted from the use of the means employed, they would be warranted in acquitting. If the gun, under the circumstances, was incapable of producing death, then it was impossible that it should do so, and the use of the qualifying adverbs by the court added but little, if anything, to the strength of the word "impossible."

In the case of *The State* v. *Swails*, 8 Ind. 524, the defendant was indicted for shooting at Lee, with intent to murder him. On the trial, the court instructed the jury, that if they believed, from the evidence, "that at the time the defendant fired the gun at said Lee, it was not charged with anything but powder and a light cotton wad—Swails being at the distance of forty feet from Lee at the time—and that at that distance the life of Lee was not at all endangered or put in jeopardy by the act of Swails in discharging the gun at him, in consequence of the manner in which it was loaded, the defendant cannot be convicted, although he may have thought that the gun was properly loaded with powder and ball, and although he may have intended to murder Lee."

The defendant was acquitted. The State excepted to the instruction, and brought the question upon it to this court under a provision of the statute.

It was said in an opinion, *per curiam*, that "the instruc-

tion given was substantially correct. It is true that the law aims to punish the intent. That Swails, in this case, had a felonious intent, cannot be doubted. But he lacked the ability and the means to carry the intent into execution. To constitute an assault, the intent and the present ability to execute must be conjoined. Thus, in this case there was the intent, but not the power. Had the gun been loaded with ball, or any other destructive missile, the offense charged would have been complete. Such shooting with a gun properly loaded would be one or another grade of crime, according to the result. To shoot at and miss Lee, would have been an assault with intent to murder; to shoot and wound, an assault and battery with like intent. To shoot and kill would have been murder. But to shoot at the distance of forty feet, with an ordinary charge of powder and wad, no matter under what supposition or with what intent, was not either of these grades of crime. The present ability to accomplish the felonious purpose was wanting."

There is a very wide difference between the facts of that case and those of the case at bar, and much that is said in the opinion there would seem to sustain the case under consideration. But if the case is to be understood as laying down the broad proposition, that to constitute an assault, or an assault and battery, with intent to commit a felony, the intent and the present ability to execute must necessarily be conjoined, it does not command our assent or approval. The case does not seem to have been very carefully considered, and no authority is referred to in support of the proposition. A number of cases are referred to in a note by the reporter, but none of them sustains so broad a proposition. The case of *Henry* v. *The State*, 18 Ohio, 32, is similar in many of its facts, but for aught that appears in the statement of that case, the accused knew that the gun was only loaded with powder and a wad, and if so, firing it at such a distance that no harm could result—the fact being known to the accused—would afford no evidence of a felonious intent. Suppose an assault and battery is perpetra-

ted on a woman, with intent to ravish, and she proves the stronger of the two, and thereby prevents the accomplishment of the object intended. The failure results alone from the want of the present ability to accomplish the end; and would it be contended that the party could not, in such a case, be convicted of the felonious intent?

To justify a conviction of an intent to murder, in the commission of an assault and battery, there must undoubtedly be some adaptation, real or apparent, in the act done and the means used, to accomplish the alleged purpose. If it is evident to every reasonable mind that the means used are entirely inadequate to the consummation of the intent charged, that fact will rebut or disprove the felonious intent, and a conviction could not be justified.

If one person should threaten to murder another, and should thereupon strike him with a small switch, with which it was impossible to accomplish the threatened purpose, the means being visibly inadequate, the threat could only be regarded as an idle declaration, and there would be no sufficient evidence of the felonious intent. So, if one should discharge a loaded gun at another who is evidently so far beyond its range as to render it impossible that injury could result, an intent to murder could not be inferred, or otherwise established.

The cases bearing on this question are very conflicting and in a state of confusion.

The whole subject is examined with care and at considerable length by Mr. Bishop, in his recent work on Criminal Law. See vol. 1, §§ 657 to 693. He refers (§ 677) to the case of *The State* v. *Swails, supra,* and precedes a statement of the facts with the following comment: "If we undertake to split hairs here, and say that there must be, in all cases, a perfect adaptedness in the act performed, and in the circumstances surrounding the prisoner at the time, to accomplish what he meant to do, we shall do away with the doctrine of attempt, as a practical element in the law, almost entirely. The reason, in most cases, why the crimi-

nal person failed to accomplish what he wished, will be found to be, that there was some want of perfect adjustment of means and surroundings to the proposed end. Therefore we may doubt whether all which was said in the following Indiana case is sound in legal doctrine." And in a note to the case, he refers to *Johnson* v. *The State*, 26 Ga. 611, and *Allen* v. *The State*, 28 Ga. 395, as holding otherwise.

After citing a number of cases where the cause of the failure to accomplish the end was unknown to, or not foreseen by, the accused, the rule in such cases is stated thus: "And, on the whole, we may deem the true doctrine to be, that, where the object is not accomplished, simply because of obstructions in the way, or because of the want of the thing to be operated upon, when the impediment is of a nature to be wholly unknown to the offender, who used appropriate means, the criminal attempt is committed." § 680. So it is said (§ 682), that "the doctrine concerning mistake of fact, as applied in cases of attempt, may, on principle, be stated as follows: Assuming the necessary intent to exist, then the act must have some adaptation also to accomplish the particular thing intended. But the adaptation need only be apparent; because the evil to be corrected relates to apparent danger, rather than to actual injury sustained. If the thing meant were accomplished, the offense would be a substantive one; but, not being accomplished, the danger as it appears to outside observation is the matter indictable under the name of attempt." See *Commonwealth* v. *McDonald*, 5 Cush. 365; *The State* v. *Wilson*, 30 Conn. 500, 506.

Now, if the rules thus stated are good law, as we think they are, what is their effect when applied to the facts of the case under consideration, and to the charge of the court in connection with the facts? The charge, as we have seen, is upon the hypothesis that the felonious intent was clearly established; and the evidence shows that the appellant shot at Kestler twice, at a distance of not exceeding thirty steps, with a shot-gun loaded with powder and shot; that one of

the discharges, at least, was fired at Kestler's face and neck, many of the shot taking effect and inflicting upon him great bodily harm, one of his eyes being destroyed and the other seriously wounded. Now, assuming that the act was done with the intent to murder Kestler, and assuming that the appellant only failed in his purpose because the shot were incapable of producing death, owing to the distance between the parties, and the manner in which the gun was loaded, which is the most favorable ground upon which the case can possibly be put for the defendant, and yet the act had some real adaptation to accomplish the thing intended. If it was not fully adapted to the purpose, it was but a single remove from it; it was capable of and did inflict grievous *bodily harm.* That it did not accomplish the design, was not attributable to any act or forbearance of the appellant, but to his mistake in supposing the shot would be effective at the distance, which fact cannot avail him as a defense. It follows, that the charge given by the court was too favorable to the defendant, and he has no cause to complain of it. For the same reasons, the instruction asked by the appellant was too broad, and, as applied to the facts of the case, was not the law, and was, therefore, properly refused.

The second instruction given by the court is also complained of. In that instruction the court said to the jury, in substance, that if they found from the evidence that the appellant unlawfully shot Kestler with a gun loaded with powder and shot, the shot taking effect upon Kestler's person, and if he so shot Kestler with the intent, at the time, of killing him, they should find the appellant guilty. This instruction, in its application to the facts of the case, was correct. The objection urged to it has already been disposed of in the discussion upon the fifth instruction given by the court.

The third instruction given contained, among others, the proposition, that in an attempt to recapture property taken by a trespasser, a resort to an unusual degree of violence, or to means which are reasonably calculated to endanger

life or limb, should not be encouraged or justified, which the appellant claims was erroneous. We think not. Indeed, the court might have gone further. The instruction does not relate to the degree of force that may be used in the defense of the possession of personal property, but in its recapture after it has been taken from the possession of the owner, in which case the law does not justify the owner in a resort to such force as will amount to a breach of the peace, but leaves him to his legal remedy.

The fourth instruction asked by the appellant contains, in substance, the proposition that the appellant might have used whatever force was necessary to enable him to recapture the stick of wood, even to the use of a deadly weapon.

This proposition would seem to need no argument in its refutation. It is fully disposed of in what has just been said in reference to the objection urged to the third instruction given by the court.

The Judgment is affirmed, with costs.

RAY, J., dissents.

*S. Major*, for appellant.

*D. E. Williamson*, Attorney General, for the State.

