STATE, Respondent, v. DAMMS, Appellant.

*December 4, 1959—January 5, 1960.*

184

For the appellant there was a brief by *McLario & Ranney* of Milwaukee, and oral argument by *John J. McLario* and *Eugene A. Ranney.*

For the respondent the cause was argued by *William A. Platz,* assistant attorney general, with whom on the brief were *John W. Reynolds,* attorney general, and *George E. Lawler,* district attorney of Waukesha county.

CURRIE, J.   The two questions raised on this appeal are:

(1) Did the fact, that it was impossible for the accused to have committed the act of murder because the gun was unloaded, preclude his conviction of the offense of attempt to commit murder?

(2) Assuming that the foregoing question is answered in the negative, does the evidence establish the guilt of the accused beyond a reasonable doubt?

Sec. 939.32 (2), Stats., provides as follows:

"An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime *except for the intervention of* another person or *some other extraneous factor."* (Italics supplied.)

The issue with respect to the first of the afore-stated two questions boils down to whether the impossibility of accomplishment due to the gun being unloaded falls within the statutory words, "except for the intervention of . . . some other extraneous factor." We conclude that it does.

Prior to the adoption of the new Criminal Code by the 1955 legislature, the criminal statutes of this state had separate sections making it an offense to assault with intent to do great bodily harm, to murder, to rob, and to rape, etc. The new code did away with these separate sections by creating sec. 939.32, Stats., covering all attempts to commit a battery or felony, and making the maximum penalty not

to exceed one half the penalty imposed for the completed crime, except that, if the penalty for a completed crime is life imprisonment, the maximum penalty for the attempt is thirty years' imprisonment.

In an article in 1956 Wisconsin Law Review, 350, 364, by Assistant Attorney General Platz, who was one of the authors of the new Criminal Code, explaining such code, he points out that "attempt" is defined therein in a more intelligible fashion than by using such tests as "beyond mere preparation," *"locus poenitentiae"* (the place at which the actor may repent and withdraw), or "dangerous proximity to success." Quoting the author (ibid., footnote, p. 364):

"Emphasis upon the dangerous propensities of the actor as shown by his conduct, rather than upon how close he came to succeeding, is more appropriate to the purposes of the criminal law to protect society and reform offenders or render them temporarily harmless."

Robert H. Skilton, in an article entitled, "The Requisite Act in a Criminal Attempt," 3 University of Pittsburgh Law Review (1937), 308, 314, advances the view that impossibility to cause death because of the attempt to fire a defective weapon at a person does not prevent the conviction of the actor of the crime of attempted murder:

"[If] the defendant does not know that the gun he fires at B is defective, he is guilty of an attempt to kill B, even though his actions under the circumstances given never come near to killing B. . . . The possibility of the success of the defendant's enterprise need only be an apparent possibility to the defendant, and not an actual possibility."

In *State v. Mitchell* (1908), 139 Iowa 455, 116 N. W. 808, 810, the defendant was convicted of assault with intent to do great bodily injury, and, on appeal, complained, among other things, that the charge in the indictment was insufficient, because it failed to allege that the gun in ques-

tion was loaded. In sustaining the conviction, the Iowa court held in part as follows (p. 459) :

"The specific objection made is that there is no allegation that the gun was loaded; but how could the defendant have intended to shoot the person assaulted unless the gun which he held in his hands was, *in fact, or, as he believed,* so loaded as that it could be fired? *If he believed that it was loaded and intended to fire it at the person assaulted, he was guilty of an assault with intent to commit great bodily injury, although in fact and contrary to his belief it was not loaded. Kunkle v. State,* 32 Ind. 220; *Commonwealth v. Creed,* 8 Gray (Mass.) 387; *People v. Lee Kong,* 95 Cal. 666 (30 Pac. 800, 17 L. R. A. 626, 29 Am. St. Rep. 165) ; *State v. Glover,* 27 S. C. 602, 4 S. E. 564; 1 McClain's Crim. Law, secs. 226, 234, 266; 1 Wharton's Crim. Law (10th ed.), sec. 642. The indictment was sufficient, therefore, in charging an intent to do great bodily injury by shooting the person assailed with a gun, although it was not specifically alleged that the gun was in fact loaded." (Emphasis supplied.)

The facts in *Mullen v. State* (1871), 45 Ala. 43, were that the accused pointed a loaded gun at another and pulled the trigger three times, but the gun would not fire because of the absence of a percussion cap. The defendant was convicted of attempt to murder. On appeal, the court upheld a charge to the jury that the absence of the cap would not avail the defendant if he supposed it was on the gun, but the jury must be satisfied beyond all reasonable doubt that the defendant did not know there was no cap on the gun. In its opinion the court quoted from 1 Bishop's Criminal Law, to the effect that in order to be guilty of the offense of an attempt to commit a felony, such as murder, assuming the necessary intent to exist, the act must have some adaptation to accomplish the result intended, but the adaptation need only be apparent, not perfect. The conviction was reversed on other grounds not here material.

A case contra to *State v. Mitchell, supra,* and *Mullen v. State, supra,* is *State v. Swails* (1857), 8 Ind. 524. In the *Swails Case* the accused was indicted for shooting at a person with intent to commit murder. The gun which was fired was loaded with powder and a light cotton wad, but no shot or ball. The court upheld a charge that the accused could not be convicted of the crime of the indictment if the life of the person fired upon was not at all endangered, or put in jeopardy by the act of the accused. In its opinion the court declared (p. 525):

"To constitute an assault, the intent and the present ability to execute, must be conjoined. Thus, in this case, there was the intent, but not the power."

However, the efficacy of the *Swails Case* as a precedent is virtually destroyed by the later Indiana case of *Kunkle v. State* (1869), 32 Ind. 220, 230, in which it was stated:

"But if the case [*State v. Swails*] is to be understood as laying down the broad proposition, that to constitute an assault, or an assault and battery, with intent to commit a felony, the intent and the present ability to execute must necessarily be conjoined, it does not command our assent or approval. The case does not seem to have been very carefully considered, and no authority is referred to in support of the proposition."

In addition to the authorities hereinbefore cited, it is stated in two recent works on criminal law that pointing an unloaded firearm at another and pulling the trigger is an attempt if the actor believes the gun to be loaded. Perkins, Criminal Law, p. 494, sec. 3, and Williams, Criminal Law, p. 496, sec. 150. See also 1 Bishop, Criminal Law (9th ed.), p. 534, sec. 750, and 1 Wharton's, Anderson, Criminal Law and Procedure, pp. 164, 165, sec. 79.

Sound public policy would seem to support the majority view that impossibility not apparent to the actor should not

absolve him from the offense of attempt to commit the crime he intended. An unequivocal act accompanied by intent should be sufficient to constitute a criminal attempt. In so far as the actor knows, he has done everything necessary to insure the commission of the crime intended, and he should not escape punishment because of the fortuitous circumstance that by reason of some fact unknown to him it was impossible to effectuate the intended result.

Counsel for Damms advance the contention that the legislative history of sec. 939.32, Stats., demonstrates that the legislature intended that such section should not be construed so as to make one guilty of the offense of attempt to commit a crime, if the attending circumstances were such as to render it impossible for the actor to have committed the crime intended.

The new Criminal Code was adopted in tentative form by ch. 623, Laws of 1953. By the provision of sec. 282 of such chapter, this tentative code was not to take effect until the 1955 legislature had completed final action on the bills to be offered by the legislative council on the recommendation of the criminal code advisory committee for amending such code. Such chapter also provided for the creation of such advisory committee. The section covering attempts in such 1953 tentative Criminal Code was numbered sec. 339.32, and contained three subsections. Sub. (3) thereof read as follows:

"It is not a defense to a prosecution under this section that, because of a mistake of fact or law other than criminal law, which does not negative the actor's intent to commit the crime, it would have been impossible for him to commit the crime attempted."

At a meeting of the criminal code advisory committee held on June 18, 1955, sub. (2) of such sec. 339.32 was amended to greatly simplify its language and have the same

wording as it now appears in sec. 939.32 (2), Stats. Immediately following such amendment, a further amendment was adopted by this committee striking sub. (3) of such sec. 339.32. It is this last action upon which counsel relies to establish the legislative intent contended for.

However, we do not deem that this demonstrates an unequivocal legislative intent that impossibility should always be a defense in a prosecution for an attempt. This is because there are other plausible explanations as to why the committee may have voted to strike sub. (3) of such sec. 339.32. One is that the committee may have thought that under the revision made in the language of sub. (2), the provision of sub. (3) was no longer necessary. Another is that the committee may have been motivated by the idea that the legal effect of impossibility be better left to the development of the common law rather than incorporating it in the code.

It is our considered judgment that the fact, that the gun was unloaded when Damms pointed it at his wife's head and pulled the trigger, did not absolve him of the offense charged, if he actually thought at the time that it was loaded.

We do not believe that the further contention raised in behalf of the accused, that the evidence does not establish his guilt of the crime charged beyond a reasonable doubt, requires extensive consideration on our part.

The jury undoubtedly believed the testimony of the deputy sheriff and undersheriff that Damms told them on the day of the act that he thought the gun was loaded. This is also substantiated by the written statement constituting a transcript of his answers given in his interrogation at the county jail on the same day. The gun itself, which is an exhibit in the record, is the strongest piece of evidence in favor of Damms' present contention that he at all times knew

the gun was unloaded. Practically the entire bottom end of the butt of the pistol is open. Such opening is caused by the absence of the clip into which the cartridges must be inserted in order to load the pistol. This readily demonstrates to anyone looking at the gun that it could not be loaded. Because the unloaded gun with this large opening in the butt was an exhibit which went to the jury room, we must assume that the jury examined the gun and duly considered it in arriving at their verdict.

We are not prepared to hold that the jury could not come to the reasonable conclusion that, because of Damms' condition of excitement when he grabbed the gun and pursued his wife, he so grasped it as not to see the opening in the end of the butt which would have unmistakably informed him that the gun was unloaded. Having so concluded, they could rightfully disregard Damms' testimony given at the trial that he knew the pistol was unloaded.

*By the Court.*—Judgment affirmed.

MARTIN, C. J., took no part.

DIETERICH, J. (*dissenting*). I disagree with the majority opinion in respect to their interpretations and conclusions of sec. 939.32 (2), Stats.

The issue raised on this appeal: Could the defendant be convicted of murder, under sec. 939.32 (2), Stats., when it was impossible for the defendant to have caused the death of anyone because the gun or pistol involved was unloaded?

Sec. 939.32 (2), Stats., provides:

"*An attempt* to commit a crime *requires* that *the actor* have an *intent* to *perform acts* and *attain a result* which, *if accomplished,* would constitute such crime and that *he does acts* toward the commission of the crime which *demonstrate unequivocally,* under all the circumstances, that he *formed*

that *intent* and would *commit* the crime *except for the intervention of another person* or *some other extraneous factor.*" (Emphasis supplied.)

In view of the statute, the question arising under sec. 939.32 (2), Stats., is whether the impossibility of accomplishment due to the pistol being unloaded falls within the statutory words *"except for the intervention of . . . or some other extraneous factor."* It does not.

In interpreting the statute we must look to the ordinary meaning of words. Webster's New International Dictionary (2d ed.), defines "extraneous" as not belonging to or dependent upon a thing, . . . originated or coming from without.

The plain, distinct meaning of the statute is: A person must form an intent to commit a particular crime and this intent must be coupled with sufficient preparation on his part and with overt acts from which it can be determined clearly, surely, and absolutely the crime would be committed except for the intervention of some independent thing or something originating or coming from someone or something over which the actor has no control.

As an example—if the defendant actor had formed an intent to kill someone, had in his possession a loaded pistol, pulled the trigger while his intended victim was within range and the pistol did not fire because the bullet or cartridge in the chamber was defective, or because someone unknown to the actor had removed the cartridges or bullets, or because of any other thing happening which happening or thing was beyond the control of the actor, the actor could be guilty under sec. 939.32 (2), Stats. But when, as in the present case (as disclosed by the testimony), the defendant had never loaded the pistol, although having ample opportunity to do so, then he had never completed performance of the

act essential to kill someone, through the means of pulling the trigger of the pistol. This act, of loading the pistol, or using a loaded pistol, was dependent on the defendant himself. It was in no way an extraneous factor, since by definition an extraneous factor is one which originates or comes from without.

Under the majority opinion the interpretations of the statute are, if a person points an unloaded gun (pistol) at someone, knowing it to be unloaded and pulls the trigger, he can be found guilty of an attempt to commit murder. This type of reasoning I cannot agree with.

He could be guilty of some offense, but not attempt to commit murder. If a person uses a pistol as a bludgeon and had struck someone, but was prevented from killing his victim because he (the actor) suffered a heart attack at that moment, the illness would be an extraneous factor within the statute and the actor could be found guilty of attempt to commit murder, provided the necessary intent was proved.

In this case, there is no doubt that the pistol was not loaded. The defendant testified that it had never been loaded or fired. The following steps must be taken before the weapon would be capable of killing.

*Description of weapon.*

Gun or Pistol.

The pistol is state's evidence Exhibit B.
Type of Pistol: 32 semiautomatic.

Assembly of Pistol.

A. Pistol grip or butt hand grasp.
B. Barrel.
C. Slide.
D. Trigger housing.

*Mechanism.*

A. To load pistol requires pulling of slide operating around barrel toward holder or operator of pistol.

B. After pulling slide to rear, safety latch is pushed into place by operator of pistol to hold pistol in position for loading.

C. A spring lock is located at one side of opening of magazine located at the bottom grip or butt of gun.

D. This spring is pulled back and the clip is inserted into magazine or bottom of pistol and closes the bottom of the grip or butt of the pistol.

E. The recoil or release of the safety latch on the slide loads the chamber of the pistol and it is now ready to fire or be used as a pistol.

The law judges intent objectively. It is impossible to peer into a man's mind, particularly long after the act has been committed.

Viewing objectively the physical salient facts, it was the defendant who put the gun, clip, and cartridges under the car seat. It was he, same defendant, who took the pistol out of the box without taking clip or cartridges. It is plain he told the truth—he knew the gun would not fire—nobody else knew that so well. In fact his exclamation was, "It won't fire. It won't fire." The real intent showed up objectively in those calm moments while driving around the county with his wife for two hours, making two visits with her at her mother's home, and drinking coffee at the home. He could have loaded the pistol while staying on the outside at his mother-in-law's home on his second trip, if he intended to use the pistol to kill, but he did not do this required act.

The majority states: "The gun itself, which is an exhibit in the record, is the strongest piece of evidence in favor of

Damms' present contention that he at all times knew the gun was unloaded. Practically the entire bottom end of the butt of the pistol is open. . . . This readily demonstrates to anyone looking at the gun that it could not be loaded." They are so correct.

The defendant had the pistol in his hand several times before chasing his wife at the restaurant and it was his pistol. He, no doubt, had examined this pistol at various times during his period of ownership—unless he was devoid of all sense of touch and feeling in his hands and fingers—it would be impossible for him not to be aware or know that the pistol was unloaded. He could feel the hole in the bottom of the butt, and this on at least two separate occasions, for he handled the pistol by taking it out of the box and showing it to his wife before he took her back to her mother's home the second time, and prior to chasing her at the restaurant.

Objective evidence here raises reasonable doubt of intent to attempt murder. It negatives intent to kill. The defendant would have loaded the pistol had he intended to kill or murder or used it as a bludgeon.

It is significant to me in arriving at this decision, that originally the following subsection was a part of that statute which is now sec. 939.32.

Sec. 339.32 (3) read as follows:

"It is not a defense to a prosecution under this section that, because of a mistake of fact or law other than criminal law, which does not negative the actor's intent to commit the crime, it would have been impossible for him to commit the crime attempted."

Sec. 939.32 (2), Stats., is a part of the Criminal Code, and as stated by Mr. William A. Platz, in his article in 1956 Wisconsin Law Review, entitled "The Criminal Code, Thumbnail History of the Code," pp. 350, 353:

"Six years of research, drafting and redrafting, propaganda pro and con, more redrafting, sometimes bitter disagreement, debate, compromise, and more redrafting, have culminated in the enactment of ch. 696, Laws of 1955, creating the new Criminal Code and amending many other sections of the Wisconsin statutes. Its effective date is July 1, 1956. . . .

"The objectives of the code, . . . may be summarized as follows: (1) Simplification of language. (2) Modernization in the light of altered criminal procedure. . . . (4) Codification by stating in one chapter general principles applicable to all crimes and classifying crimes as nearly as possible according to the social interest protected. (5) Maintaining a fair balance between society's interest in speedy and efficient law enforcement and its interest in protecting accused persons from unwarranted deprivation of liberty by criminal process."

The above-mentioned sec. 339.32 (3), was stricken by the criminal code advisory committee, after what is now sec. 939.32 (2), Stats., was drafted in its present form.

This leads me to conclude that impossibility of performance is a defense and that the elimination of this defense was not contemplated to be within the purview of the language in sec. 939.32 (2), Stats.

The assistant attorney general contends and states in his brief:

"In the instant case, the failure of the attempt was due to lack of bullets in the gun but a loaded magazine was in the car. If defendant had not been prevented by the intervention of the two police officers, or possibly someone else, or conceivably by the flight of his wife from the scene, he could have returned to the car, loaded the gun, and killed her. Under all the circumstances the jury were justified in concluding that that is what he would have done, but for the intervention."

If that conclusion is correct, and juries are allowed to convict persons based on speculation of what *might* have been

done, we will have seriously and maybe permanently curtailed the basic rights of our citizenry to be tried only on the basis of proven facts.

I cannot agree with his contention or conclusion.

The total inadequacy of the means (in this case the unloaded gun or pistol) in the manner intended to commit the overt act of murder, precludes a finding of guilty of the crime charged under sec. 939.32 (2), Stats.